UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
THOMAS FRANCIS RIZZUTO

<u>For Online Publication Only</u>

                              Plaintiff,

                                                    **<u>MEMORANDUM & ORDER</u>**
              -against-                              13-CV-6079 (JMA) (AKT)

CAROLYN W. COLVIN,
*Acting Commissioner of Social Security*,

                              Defendant.
-----------------------------------------------------------------X
**APPEARANCES:**

Herbert S. Forsmith
Office of Herbert S. Forsmith
26 Broadway 17th Floor
New York, NY 10004
          *Attorney for Plaintiff*

Vincent Lipari
Assistant United States Attorney
United States Attorney's Office
Eastern District of New York
610 Federal Plaza, 5th Floor
Central Islip, NY 11722
          *Attorney for Defendant*

**AZRACK, United States District Judge:**

    Plaintiff Thomas Rizzuto challenges the decision of the Acting Commissioner of Social Security, who concluded, after a hearing before an Administrative Law Judge, that plaintiff is not disabled for purposes of receiving disability insurance benefits under Title II of the Social Security Act. The case is before the Court on the parties' cross-motions for judgment on the pleadings. Because the Administrative Law Judge's decision was supported by substantial evidence and applied the proper legal standards, the defendant's motion for judgement on the pleadings is GRANTED, and the plaintiff's cross-motion is DENIED.

## I. BACKGROUND

**A. Procedural History**

On April 28, 2011, plaintiff filed for disability insurance benefits and supplemental security income with the Social Security Administration ("SSA"). Plaintiff alleged that his disability began on March 25, 2011. (Administrative Transcript ("Tr.") 231–49.) In July 2011, the SSA initially denied plaintiff's disability application. (Tr. 127–30.) In May 2012, plaintiff appeared at a hearing before Administrative Law Judge ("ALJ") Margaret Donaghy, who adjourned the hearing to allow plaintiff time to obtain legal representation and a "Social Security Psychological Assessment." (Tr. 112–24.) On April 4, 2013, the ALJ held a hearing where plaintiff, who was now represented by counsel, testified in person. (Tr. 34–111.) In addition, at the hearing, a vocational expert testified over the telephone. Plaintiff argued that a combination of cardiac and psychiatric impairments rendered him disabled. (See Tr. 59–60.)

In May 2013, the ALJ found that plaintiff was not disabled. (Tr. 17–33.) In August 2013, the Appeals Council denied review of the ALJ's decision, and plaintiff filed this action pursuant to 42 U.S.C. § 405(g). See (Tr. 2–6.)

**B. Plaintiff's Background and Testimony**

Plaintiff was born in September 1978 and was 32 years old when he filed for disability. (Tr. 48.) Plaintiff, who stands six feet tall and weighs 276 pounds, is obese. (Tr. 22.)

Plaintiff completed the tenth grade, but has not received a diploma or GED. (Tr. 299.) Plaintiff last worked as a private driver for Luxury Worldwide Transportation from 2008 until late 2009 or 2010. (Tr. 52–56, 299–300.) Prior to his work as a driver, plaintiff worked as a custodian for the City of New York from 1997 to 2006, and briefly worked at Long Island College Hospital ("LICH") from 1997 to 1998. (Tr. 57–58, 300.). Since leaving Luxury Worldwide Transportation,

plaintiff has been unemployed.  As explained further below, in March 2011, suffered a heart attack and underwent bypass surgery on April 4, 2011.  (Tr. 53–54.)

Plaintiff completed a SSA function report on April 6, 2011.[1]  (Tr. 289–97.)  In the report, plaintiff stated that he lived with his mother, father, and sister, and that his family prepared meals and did household chores because he was unable to do so.  (Tr. 290, 296.)  He claimed that he could no longer play sports, drive, take the garbage out, tie his shoes, or put on socks without help. (Tr. 290.)  He further stated that sleeping was uncomfortable, and that it was difficult to shave and use the bathroom.  (Tr. 290–91.)  Although he had a driver's license, plaintiff asserted that he could not drive and could only ride in the backseat of a car because his doctor told him that airbags in the front seat could hit his chest.  (Tr. 292–93.)  Plaintiff stated that on a normal day, he would eat breakfast, shower, walk around the block, eat lunch, watch television, eat dinner, watch more television, and then go to bed.  (Tr. 291.)  Plaintiff indicated that he could not lift more than five pounds, or stand for long periods of time.  (Tr. 294.)  Plaintiff further complained that he could not kneel, squat, or reach, and that he could only walk about two blocks, five to ten minutes at a time.  (Tr. 293–295.)  Finally, Plaintiff stated that he had no social activities, and had no other hobbies besides watching television.  (Tr. 290, 293–94.)

At the April 2013 hearing, plaintiff testified before the ALJ.  In his testimony, plaintiff stated that his cardiac impairments caused him to feel sluggish, fatigued, weak, and tired.  (Tr. 60.) He testified that he could not do household chores because he was afraid of elevating his heartrate. (Tr. 60, 64.)  According to plaintiff, he would experience shortness of breath climbing stairs and walking more than a block-and-a-half.  (Tr. 70.)  Plaintiff also testified that he could only stand in

---

[1] Although this report is dated April 6, 2011, when plaintiff was still in the hospital, it appears that this report was actually filled out sometime after May 4, 2011.  (Tr. 288.)

one place continuously for ten to twenty minutes before tiring, and could only sit in one place for ten to twenty minutes before feeling pain. (Tr. 72–73.)

Plaintiff also testified that he developed an anxiety disorder related to his cardiac condition. (Tr. 60–61.) He testified that he had nightmares of dying from a heart attack and had difficulty sleeping. (Tr. 67.) Plaintiff also testified that he had panic attacks and had difficulty concentrating for long periods of time. (Tr. 60, 73.) Although plaintiff was prescribed Cymbalta and Xanax to treat his anxiety, he testified that that he did not take the Cymbalta every day because he was afraid of taking it because of the side effects. (Tr. 61–62.) Plaintiff stated that he was afraid to take public transportation because it was "dangerous" and that he felt confined to his house. (Tr. 65, 67.)

Plaintiff's testimony contained a number of inconsistencies. While plaintiff, in both his function report and testimony stated that he sat in the backseat of cars to prevent airbags from striking him in the chest, he also admitted during the hearing that he drove his mother to Macy's the day before the hearing and that he drove one to three times per week. (Tr. 64–65, 292–93.) Moreover, despite plaintiff's claims that he was confined to the house and did not socialize, he admitted at the hearing that he went to a tanning salon with his friends the day before the hearing and "hung out a little bit." (Tr. 26, 67.)

## C. Medical Evidence

### 1. Plaintiff's Heart Attack and Surgery

From March 25 to March 30, 2011, plaintiff received inpatient treatment at LICH after complaints of nausea and mid-sternal chest pain. (Tr. 813, 817.) An electrocardiogram ("EKG") showed that plaintiff might have had a silent heart attack. (Tr. 825.) Plaintiff was admitted to the hospital and started on Lipitor, aspirin, Lisinopril, metoprolol, ReoPro, and heparin. (Tr. 813.)

4

On March 28, plaintiff underwent cardiac catheterization, at which time a "percutaneous coronary intervention (PCI) of the proximal and distal right coronary artery (RCA) was performed." (Tr. 813.)

On March 30, 2011, plaintiff was transferred to Beth Israel Medical Center ("Beth Israel"), and on April 4, Dr. Robert Tranbaugh performed cardiac bypass surgery. (Tr. 395.) On April 8, plaintiff was discharged, with the principal diagnoses of coronary artery disease and non-ST elevated myocardial infarction. (Tr. 395, 451, 456–57.)

### 2. Treating and Consultative Physicians Concerning Coronary Issues and Physical Limitations

#### a. Dr. Hugo Rosero

After plaintiff's hospitalization, he began seeing cardiologist Dr. Hugo Rosero, beginning on April 20, 2011. (Tr. 892.) During this visit, Dr. Rosero noted both severe coronary artery disease and elevated hypertension and cholesterol, but a negative review of symptoms. (Tr. 892.) Eight days later, plaintiff returned to LICH complaining of syncope,[3] but was discharged the next day in stable condition. (Tr. 788–89.)

Plaintiff also saw Dr. Rosero in June 2011, October 2011, and February 2012. (Tr. 891, 888, 889.) The records from these visits indicate no change in plaintiff's condition and that plaintiff was feeling well and reported no symptoms. (Tr. 891, 888, 889.)

On June 12, 2012, Dr. Rosero completed an SSA "medical source statement of ability to do work-related activities (physical)." (Tr. 879–84.) Dr. Rosero opined that plaintiff could continuously lift up to fifty pounds, and could sit, stand and walk for eight hours at a time during an eight-hour workday. (Tr. 879-80.) Furthermore, Dr. Rosero concluded that Plaintiff could

---

[3] Syncope is a "temporary loss of consciousness" caused by a decrease in blood pressure. Flores v. United States, 142 F. Supp. 3d 279, 286 (E.D.N.Y. 2015).

reach, handle, push, pull, operate foot controls, climb stairs, climb ladders, balance, stoop, kneel, crouch, and crawl continuously for over two-thirds of the day.  (Tr. 881–82.)

### b.  Dr. Vinod Thukral

On January 6, 2012, the Division of Disability Determination referred plaintiff to Dr. Vinod Thukral for a consultative examination.  According to Dr. Thukral, plaintiff stated that he had been feeling "fine" since the syncopal episode, and denied any chest pain, shortness of breath, or other related symptomology.  (Tr. 861.)  However, plaintiff did say that he had intermittent chest pain, which was precipitated by lifting, pushing, and pulling.  (Tr. 861.)  Upon examination, Dr. Thukral observed that plaintiff was obese, but in no acute distress.  (Tr. 863.)  Dr. Thukral's examinations of plaintiff's skin, face, back, extremities, musculoskeletal and neurological functions were all normal.  (Tr. 863–64.)  Dr. Thukral, "by history," assessed that plaintiff had hypertension, hyperlipidemia, coronary artery disease, status post-coronary artery bypass graft, anxiety and depression, intermittent chest pain at surgical site, obesity, and diet controlled diabetes.  (Tr. 864–65.)  Dr. Thukral concluded that plaintiff was not limited in his ability to sit or stand, but that he may be moderately limited in his ability to climb, push, pull, or carry heavy objects.  (Tr. 864–65.)  Dr. Thukral stated that plaintiff should avoid activities requiring moderate or greater exertion.  (Tr. 864–65.)

Dr. Thukral also completed an SSA "medical source statement of ability to do work-related activities (physical)." (Tr. 867–72.)  Dr. Thukral indicated that plaintiff could never lift any weight, although plaintiff could sit and stand up to eight hours each in an eight-hour workday.  (Tr. 867.)  Dr. Thukral opined that plaintiff could only walk up to eighty minutes, ten minutes at a time. (Tr. 867–68.)  Dr. Thukral also noted that plaintiff could not reach, feel, push, pull, use or operate foot controls, climb stairs or ladders, balance, stoop, kneel, crouch, or crawl.  (Tr. 870.)

### 3. Providers Concerning Plaintiff's Mental/Psychiatric Limitations

*a. Dr. Rosero*

As explained above, Dr. Rosero completed an SSA medical source statement concerning plaintiff's physical condition.  On the same date, June 12, 2012, Dr. Rosero also completed an SSA "medical source statement on ability to do work related activities (mental)." (Tr. 885–87.) According to Dr. Rosero, plaintiff had no mental functional limitations. (Tr. 885–87.) Dr. Rosero opined that plaintiff could understand, carry out and remember both simple and complex instructions, and could make both simple and complex work related judgements.  (Tr. 885.) Additionally, Dr. Rosero stated that plaintiff would have no difficulty interacting with the public, co-workers, and supervisors.  (Tr. 886.)

*b. Dr. Leonard Langman*

Dr. Leonard Langman, a neurologist and psychiatrist, treated plaintiff on four occasions. (Tr. 69–70, 874.)  Plaintiff stopped seeing Dr. Langman because Dr. Langman "wasn't under [plaintiff's] coverage." (Tr. 69–70.)

In a one-page letter dated May 23, 2012, Dr. Langman stated that plaintiff was under his care for cardiac psychosis and concluded that plaintiff was "totally and permanently disabled." (Tr. 874.) . (Tr. 874.)  Dr. Langman's letter stated that plaintiff had become depressed after his bypass surgery, and that plaintiff had complained of anxiety, insomnia, and intermittent auditory hallucinations. (Tr. 874.)  Dr. Langman's letter also noted that plaintiff's language and speech were pressured and that he appeared anxious. (Tr. 874.)

*c. Dr. David Mahony*

On July 12, 2012, at the ALJ's request, plaintiff attended a psychiatric consultative examination performed by Dr. Mahony, a psychologist.  (See Tr. 122, 901–04.)  Dr. Mahony

observed that plaintiff's attention, concentration, and memory skills were impaired due to cognitive limitations and symptoms of anxiety.  (Tr. 902–03.)  In a written psychiatric evaluation, Dr. Mahony diagnosed plaintiff with a learning disorder and general anxiety disorder.  (Tr. 903–04.)  In that evaluation, Dr. Mahony opined that, due to plaintiff's cognitive and psychological problems, he would have moderate difficulties learning new tasks, performing complex tasks independently, making appropriate decisions, relating to others, and dealing with stress.  (Tr. 903.)

Dr. Mahony also completed an SSA "medical source statement of ability to do work related activities (mental)."  (Tr. 905–08.)  Dr. Mahony found no limitations in plaintiff's ability to understand, carry out, and perform simple work related functions.  (Tr. 905.)  However, Dr. Mahony stated that plaintiff would have mild difficulties understanding, remembering, and carrying out complex instructions, as well as moderate difficulties making complex work-related decisions.  (Tr. 905.)  Furthermore, Dr. Mahony opined that plaintiff would have "marked"[4] limitations in interacting appropriately with the public, supervisors, and co-workers, as well as marked limitations in responding appropriately to changes in the workplace.  (Tr. 906.)

### d.  Dr. Doug Luce

On March 27, 2013, plaintiff began treatment at the Park Slope Center for Mental Health with Dr. Doug Luce.  (Tr. 368-77.)[5]  Based on that visit, Dr. Luce filled out an initial psychiatric evaluation and assessed plaintiff with panic attacks and anxiety.  (Tr. 371–74.)  Dr. Luce noted that plaintiff's speech was clear, his thoughts were logical, and his mood was euthymic.  (Tr. 374.)  Additionally, Dr. Luce concluded that plaintiff's insight and judgement were both within normal

---

[4]  The SSA medical source statement defines "marked" limitations as "serious limitations" that "constitute a "substantial loss in the ability to effectively function."  (Tr. 905.)

[5]  Plaintiff's counsel provided records from Dr. Luce to the ALJ approximately two weeks after the hearing; the ALJ had left the hearing open for this purpose.  (Tr. 109, 364.)

limits and noted no cognitive impairments.  (Tr. 374.)  Dr. Luce assessed plaintiff a Global Assessment Functioning ("GAF") score of 55, which indicates that an individual experiences moderate difficulty in social, occupational, or school situations.[6]  When plaintiff returned to see Dr. Luce on April 10, 2013, no changes in his condition were observed or reported.  (Tr. 377.)

## D. Vocational Evidence

Vocational expert ("VE") Dr. David Vandergoot testified by telephone at the hearing.  (Tr. 75–107).  The ALJ posed a hypothetical to Dr. Vandergoot based on certain assumed limitations and plaintiff's vocational profile.  (Tr. 82–83.)  The ALJ then asked whether there were jobs in the national economy that such an individual could perform.  (Tr. 83.)  Dr. Vandergoot responded with three jobs serving as a representative sample of the type of work available: a cleaner in a car dealership, a kitchen helper, and a hospital cleaner.  (Tr. 83–85.)

## E. The ALJ's Decision

The ALJ applied the five-step process, described below, pursuant to 20 C.F.R. § 404.1520 and found that plaintiff was not disabled.  (Tr. 28–29.)

At the second step of the analysis, the ALJ concluded that plaintiff had severe impairments of coronary artery disease, obesity, panic attacks, anxiety and cardiac neurosis.  (Tr. 22.)  At step three, the ALJ concluded that these impairments did not meet or equal any of the listed impairments that would automatically render plaintiff disable.  (Tr. 23.).  At step four, the ALJ addressed the plaintiff's residual functional capacity ("RFC").  An RFC determination identifies what work a claimant can still perform, despite his limitations.  See 20 C.F.R. § 404.1545.  The

---

[6] GAF is a scale that indicates the clinician's overall opinion of an individual's psychological, social, and occupational functioning.  Petrie v. Astrue, 412 F. App'x 401, 406 (2d Cir. 2011).  A GAF score of 51–60 indicates that an individual experiences moderate difficulty in social, occupational, or school situations.  Marvin v. Colvin, No. 12-CV-1779, 2014 WL 1293509, at *2 (N.D.N.Y. Mar. 31, 2014).

ALJ concluded that plaintiff could perform "less than the full range of medium work" and specified that plaintiff could, inter alia: (1) lift and carry fifty pounds occasionally and twenty-five pounds frequently; (2) stand and walk eight hours in an eight-hour day; (3) understand and carry out simple, routine instructions; (4) maintain attention and concentration for simple routine work; and (5) perform low-stress work with occasional interaction with co-workers and the public. (Tr. 24.)

In considering plaintiff's physical limitations, the ALJ adopted the opinion of Dr. Rosero, a treating source, over the opinion of the consulting physician, Dr. Thukral. (Tr. 26.) Regarding plaintiff's mental limitations, the ALJ gave some weight to Dr. Rosero's opinion and some weight to Dr. Mahony's opinion. (Tr. 26.) The ALJ, however, rejected the portion of Dr. Mahony's opinion finding that plaintiff had "marked" social impairments. The ALJ reasoned that Dr. Mahony's opinion on this point was inconsistent with "other evidence of the record [and] the claimant's daily activities." (Tr. 26.) The ALJ also rejected Dr. Langman's opinion because it was based mostly on plaintiff's statements, was inconsistent with his stated daily activities, and was not supported by any treatment notes. (Tr. 26).

The ALJ also considered plaintiff's testimony about his symptoms. Although the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the ALJ concluded that plaintiff's testimony concerning the "intensity, persistence, and limiting effects" of his symptoms were "not entirely credible." (Tr. 26.) The ALJ discounted plaintiff's testimony because of the inconsistencies in his testimony as well as the lack of support for his statements in the objective medical evidence. (Tr. 26.)

Based on the plaintiff's RFC, the ALJ concluded that plaintiff could not perform any of his past relevant work, including the "light and semiskilled" work of a driver. (Tr. 26.) However, at the fifth step of the sequential process, the ALJ credited the VE's testimony and concluded that,

10

given plaintiff's RFC, there were still jobs in significant numbers in the national economy that plaintiff could perform.  (Tr. 27.)

## II.  DISCUSSION

### A.  Legal Standards

#### 1.  Standard for Entitlement to Disability Benefits

Under the Social Security Act, disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual is disabled when his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

The Commissioner's regulations set out a five-step sequential process to determine whether an individual is disabled.  C.F.R. § 404.1520.  The Commissioner must determine:      (1) whether the claimant is working, (2) whether the claimant has a 'severe impairment,' (3) whether the impairment is one listed in Appendix 1 of the regulations that conclusively requires a determination of disability, (4) whether the claimant is capable of continuing in his prior type of work; and (5) whether there is another type of work the claimant can do.  Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).  The instant case turns on the ALJ's determinations concerning the fourth and fifth steps of this process.  At the fourth step, the Commissioner determines the plaintiff's RFC and whether the plaintiff can still do his past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  At the fifth step, the Commissioner decides whether, taking into account the

claimant's age, work experience, education, and RFC, he can adjust to other work existing in significant numbers in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).  The claimant has the burden of proving the requirements of the first four steps.  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  If the claimant meets his burden, the burden of proof then shifts to the Commissioner to prove that there is other "work in the national economy that the claimant can do."  Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

### 2. Standard of Review

In reviewing a denial of disability benefits by the SSA, it is not the function of the district court to review the record de novo, but instead to determine whether the ALJ's conclusions "'are supported by substantial evidence in the record as a whole, or are based on an erroneous legal standard.'"  Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (quoting Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997)).  Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Perez, 77 F.3d at 41 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).  Thus, the Court will not look at the record in "isolation, but will view it in light of other evidence that detracts from it."  State of New York ex rel. Bodnar v. Sec. of Health and Human Servs., 903 F.2d 122, 126 (2d Cir. 1990).  An ALJ's decision is sufficient if it is supported by "adequate findings . . . having rational probative force."  Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

Generally, when a reviewing court is unable to "'unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ,' [the reviewing court] will not 'hesitate to remand for further findings or a clearer explanation for the decision.'"  Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (quoting Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)).  On the other hand, in some circumstances, remand may not be necessary even if an ALJ's decision does not explicitly address certain pieces of evidence or factors set out in the SSA's regulations, or the decision's findings or analysis on certain issues are relatively limited.  Generally, remand is not required where the ALJ's decision is specific enough to allow for meaningful review by courts, the decision and record allow a reviewing court to glean the rationale of the ALJ's decision, and the decision indicates that the ALJ considered all relevant evidence.  See, e.g., Cichocki, 729 F.3d at 177 (holding that an ALJ's failure to conduct a complete function-by-function analysis as part of an RFC determination does not require remand where the ALJ's analysis "affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence"); Cichocki v. Astrue, 534 F. App'x 71, 76 (2d Cir. 2013) (holding that the ALJ's failure to address all of the credibility factors in 20 C.F.R. § 416.929(c)(3) did not require remand because the court could glean the rationale of the ALJ's decision); Mongeur, 722 F.2d at 1040 ("When . . . the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.").

## B.  Plaintiff's Arguments

Plaintiff's brief contains a number of conclusory arguments that are devoid of any specifics or citations to the record, and rely on little, if any, case law.  (See Cross-Mot. J. Pleadings at 6–8.)  For example, plaintiff's brief generally asserts that the ALJ did not adequately develop the record because the ALJ failed to obtain updated medical source statements from treating and examining doctors and failed to fill "gaps in the records."  (Id. at   6–7.)  Plaintiff's argument, however, does not discuss any of the specific doctors at issue or identify the other alleged gaps in the record.  As explained more fully below, this and the conclusory arguments raised in plaintiff's brief are insufficient and, ultimately, meritless.

In addition to the conclusory arguments raised in plaintiff's brief, plaintiff attempts to incorporate by reference all of the arguments that he raised in letters to the ALJ and the Appeals Council.  Unlike the arguments raised in plaintiff's brief, the arguments in these letters to the ALJ and Appeals Council do provide specifics and details.  However, plaintiff's attempt to simply incorporate "by reference" all of these arguments into his brief is not the appropriate way to raise issues to this Court.[7]  In light of this, the Court concludes that plaintiff has waived the arguments that he raises solely "by reference" to his submissions below.

In any event, even assuming that these arguments are properly before the Court, the Court finds, for the reasons stated below, that none of the arguments that plaintiff seeks to incorporate by reference would warrant a remand of the ALJ's decision.[8]

---

[7]  Although plaintiff's letters to the ALJ and the Appeals Council at least raise specific arguments tied to discrete portions of the record, these letters, which advance more than ten different arguments, contain only a single case citation.

[8]  Although plaintiff's attempt to incorporate all of his arguments below "by reference" is not appropriate, the Court notes that defendant completely ignored this issue and does not address plaintiff's "incorporation by reference" tactic or the arguments plaintiff raised to the ALJ or the Appeals Council.  In light of this, the Court is left to address all of these arguments without the benefit of any input from defendant on these issues.

**C.  Duty to Develop the Record**

In a Social Security benefits proceeding, an ALJ has an affirmative duty to develop the record where there are deficiencies and "clear gaps in the administrative record." Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (citing Perez, 77 F.3d at 47); 20 C.F.R. § 404.1512(d).  However, "'the flip-side of this same proposition'" is that "'where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Petrie v. Astrue, 412 F. App'x 401, 406 (2d Cir. 2011) (quoting Rosa, 168 F.3d at 79 n.5).  The ALJ's duty to develop the record exists even when a claimant is represented by counsel.  Rosa, 168 F.3d at 79.  This duty is heightened when a claimant proceeds pro se.  Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009).

Plaintiff argues that the ALJ failed to adequately develop the record in three respects.  First, plaintiff contends that the ALJ should have re-contacted Dr. Rosero to obtain updated records and an updated medical source statement because, although the hearing took place in April 2013, plaintiff's last documented visit with Dr. Rosero was in February 2012 and Dr. Rosero's medical source statement was prepared in June 2012.  (Tr. 383.)  The Court disagrees; the record before the ALJ was sufficient.  Notably, plaintiff does not even indicate when he saw Dr. Rosero since the last documented visit in February 2012.  Moreover, the ALJ already attempted to subpoena documents from Dr. Rosero in December 2012.  (Tr. 185).  Finally, the Court notes that, after the hearing, the ALJ held the record open for two additional weeks to allow plaintiff to submit additional evidence.  (Tr. 110).  Although plaintiff submitted records from Dr. Luce after the hearing, plaintiff did not submit any additional records from Dr. Rosero even though the ALJ explicitly invited plaintiff's counsel to do so if there were any "outstanding significant records"

15

from Dr. Rosero.  (See Tr. 110, 364–66).  Also, plaintiff's counsel never suggested to the ALJ that updated medical source statements from Dr. Rosero were necessary and there is little reason to believe that Dr. Rosero would have reached any different conclusions in updated statements.  In light of all of the above, the ALJ satisfied her duty to develop the record with respect to Dr. Rosero's records.  Cf. Eusepi v. Colvin, 595 F. App'x 7, 9 (2d Cir. 2014) (holding that the ALJ did not err in failing to obtain a treating physician's report where plaintiff's counsel submitted additional records after the hearing, "representing that the matter was ready to be taken under advisement" and the record evidence was "adequate" to allow the ALJ to make a disability determination).

Second, plaintiff argues that the ALJ should have requested a medical source statement from Dr. Luce.  Even if an ALJ fails to request a medical source statement from a treating physician, remand is not required if there was sufficient evidence in the record to allow the ALJ to determine a claimant's RFC.  See Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 32 (2d Cir. 2013) (holding that even though the record contained no formal opinions from the claimant's treating sources, there was sufficient evidence to permit the ALJ to determine the claimant's RFC because plaintiff's counsel assembled a "voluminous" medical record, which included a treating physician's assessment of the claimant's limitations); see also Eusepi v. Colvin, 595 F. App'x at 9.  Here, the record already included medical source statements about plaintiff's mental limitations from Dr. Rosero and Dr. Mahony, an assessment from Dr. Langman, and the treatment notes and mental status evaluation from Dr. Luce.  (Tr. 364–77, 874, 885–87, 901–07).  This was a sufficiently complete medical history for the ALJ to make her determination.  Moreover, the fact that Dr. Luce only saw plaintiff twice—with treatment beginning approximately a week before the April 2013 hearing—weighs against plaintiff's argument that a medical source statement from Dr.

Luce was necessary.  Finally, plaintiff's counsel had two weeks after the hearing to obtain evidence and used that opportunity to submit medical reports from Dr. Luce, but never suggested to the ALJ that a medical source statement from Dr. Luce was necessary.  In light of all of the above, the ALJ was not required to seek a medical source statement from Dr. Luce.  See Tankisi, 521 F. App'x. at 32.

Third, plaintiff argues that the ALJ should have ordered an intelligence examination because Dr. Mahony identified cognitive limitations and diagnosed plaintiff with a learning disorder.  (Tr. 902–04).  "It can be reversible error for an ALJ not to order a consultative examination when an examination is required for an informed decision."  Tankisi, 521 F. App'x at 32.  "However, an ALJ is not required to order a consultative examination if the facts do not warrant or suggest the need for it."  Id.

Here, the ALJ refused to order an intelligence examination because plaintiff had a substantial history of gainful employment, there was no evidence of a cognitive impairment, and Dr. Rosero, whom the ALJ accorded greater weight, did not note any mental limitations.[9]  (Tr. 25– 26.).  This was not error.  Cf. Tankisi, 521 F. App'x at 32 (holding that the "ALJ was not obligated to order a consultative intelligence examination in response to a few stray remarks unsupported by other record evidence and not alleged as a potential disability").

**D.  RFC Analysis**

Plaintiff raises a number of arguments regarding the ALJ's RFC analysis.  Plaintiff argues that the ALJ erred by:  (1) failing to engage in a complete function-by-function analysis; (2) improperly analyzing the conflicting opinions of Dr. Rosero and Dr. Thukral concerning plaintiff's

[9]  In refusing plaintiff's request for an intelligence evaluation, the ALJ did not address the conclusions of Dr. Luce. Nevertheless, the Court notes that Dr. Luce concluded that plaintiff's cognition and insight were within normal limits and estimated that plaintiff had "average" intelligence.  (Tr. 374.)

physical limitations; (3) improperly weighing and analyzing the conflicting opinions of Dr. Mahony and Dr. Rosero regarding plaintiff's mental limitations; and (4) failing to address Dr. Luce's GAF finding.  (Tr. 380–87).

### 1. Function-by-Function Analysis

 "Before an ALJ classifies a claimant's RFC based on exertional levels of work . . . [the ALJ] 'must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis,'" including those functions provided in 20 C.F.R. §§ 404.1545(b)–(d), 416.945.  Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (quoting SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996)).  The functions described in those regulations "include physical abilities such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions; mental abilities such as understanding, remembering, carrying out instructions, and responding appropriately to supervision; and other abilities that may be affected by impairments . . . ."  Id.

However, even if an ALJ fails to perform an explicit function-by-function analysis, remand is not necessary "[w]here an ALJ's analysis at Step Four regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous."  Id. at 177.  "Remand may be appropriate, however, where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review."  Id.

Plaintiff argues that the ALJ erred because her RFC determination did not engage in a function-by-function assessment and failed to address, inter alia, whether the plaintiff could use his hands and plaintiff's ability to perform postural abilities, including stooping.  Plaintiff points

out that Dr. Thukral concluded that plaintiff could not use his hands for fine or gross manipulation and could never perform postural activities, such as stooping.

Although the ALJ did not explicitly address certain functions, remand is not warranted. As part of the ALJ's RFC determination, the ALJ adopted Dr. Rosero's opinion regarding the claimant's physical limitations and explicitly noted Dr. Rosero's postural finding. (Tr. 25–26.) Since Dr. Rosero's opinion concluded that plaintiff had no limitations concerning his hands or posture—and the ALJ adopted that opinion—remand is not necessary, even though the ALJ did not address those functions any further in her opinion. See Skidds v. Colvin, No. 13-CV-00894, 2016 WL 1162518, at *1, *4 (N.D.N.Y. Mar. 23, 2016) (holding that even though the ALJ's explicit findings about the claimant's mental and physical functioning could have been more detailed, no remand was required because the ALJ's explanation of the plaintiff's RFC still provided an adequate basis for meaningful review and was supported by substantial evidence).

### 2. Consideration of the Medical Opinions

#### i. Standard for Evaluating the Opinions of Treating and Consultative Physicians

An ALJ's decisions regarding the weight to be accorded to each medical opinion in the record and how to reconcile conflicting medical opinions is governed by the treating physician rule. 20 C.F.R. § 404.1527(c).

According to the treating physician rule, if a treating physician's opinion regarding the nature and severity of an individual's impairments is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ will credit that opinion with "controlling weight." 20 C.F.R. § 404.1527(c)(2); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). The treating physician rule gives "deference to the opinions of treating physicians based on the view that

opinions based on a patient-physician relationship are more reliable than opinions based, say, solely on an examination for purposes of the disability proceedings themselves." Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

If a treating physician's opinion is not given controlling weight, the ALJ must consider various factors in determining how much weight to give the opinion, including:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship;
>
> (ii) the evidence in support of the physician's opinion, including any medical signs, laboratory findings, and supporting explanations provided by the physician;
>
> (iii) the consistency of the opinion with the record as a whole;
>
> (iv) whether the opinion is from a specialist; and
>
> (v) any other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

See 20 C.F.R. § 404.1527(c); Halloran, 362 F.3d at 32. An ALJ is required to give "good reasons" in support of her determination on the weight given to a treating physician's opinion, and the failure to provide "good reasons" for not crediting the opinion is grounds for remand. See Schaal v. Apfel, 134 F.3d 496, 503–04 (2d Cir. 1998).

Because the opinions of consultative physicians are not subject to the treating physician rule, such opinions are not entitled to presumptive weight. See 20 C.F.R. § 404.1527(c); see also Pereya v. Comm'r of Soc. Sec., No. 13-CV-173, 2014 WL 4105296, at *8 (N.D.N.Y. Aug. 20, 2014). Nevertheless, ALJs must still consider the findings of consultative physicians. 20 C.F.R. § 404.1527(c). Consultative medical opinions are evaluated using the same factors that are used to weigh and evaluate the opinions of treating physicians. 20 C.F.R. §§ 404.1527(c)(2)–(6), see also 404.1527(e)(2)(ii).

*ii.  Dr. Rosero's and Dr. Thukral's Opinions About Physical Limitations*

Plaintiff argues that the ALJ failed to address the favorable portions of Dr. Thukral's opinion and failed to reconcile the conflict between Dr. Thukral's assessment and Dr. Rosero's assessment.  (Tr. 382–83.)

This argument is not persuasive.  The ALJ made clear that she was adopting Dr. Rosero's opinion and gave it "more weight" because Dr. Rosero is a treating source who saw plaintiff multiple times and had better information about plaintiff's overall condition.  (Tr. 26.)  That was sufficient.  Plaintiff points to no authority indicating that a more detailed rationale and analysis is required when an ALJ adopts the opinion of a treating physician over a consulting physician.

Finally, contrary to plaintiff's contention, the ALJ was not required to explicitly address every single point discussed in Dr. Thukral's opinion.  See Mongeur, 722 F.2d at 1040; Santos v. Astrue, 709 F. Supp. 2d 207, 211 (S.D.N.Y. 2010) (finding that the ALJ properly considered the opinions of two examining physicians without quoting their reports in detail when the ALJ's opinion cited the reports' contents to support his conclusion).

*iii.  Dr. Rosero's and Dr. Mahony's Opinions About Mental Limitations*

In making the RFC determination regarding plaintiff's mental limitations, the ALJ gave some weight to Dr. Rosero's opinion and some weight to Dr. Mahony's opinion.  The ALJ, however, declined to adopt Dr. Mahony's opinion that plaintiff has marked social limitations because that opinion was not consistent with the other evidence of record and claimant's testimony about his daily activities.

Plaintiff argues that these conclusions were erroneous and that the ALJ's analysis was deficient.  As explained below, the Court disagrees.

Plaintiff argues that the ALJ improperly rejected Dr. Mahony's marked limitations findings and should not have given any weight to Dr. Rosero's mental assessment because Dr. Rosero, a cardiologist, did not examine or treat plaintiff from a psychiatric perspective, and Dr. Rosero's notes and records did not discuss any psychiatric issues or examination. These were arguments for the ALJ to weigh and consider—they are not a basis to remand this case. See Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) ("It is not our function to determine de novo whether [the plaintiff] is disabled . . . ."). Moreover, as the ALJ noted, plaintiff's anxiety condition was related to his heart issues. (Tr. 25.) Thus, it made sense for the ALJ to accord Rosero's opinion about plaintiff's mental limitations some weight. It is also clear that the ALJ did not give Dr. Rosero's opinion undue weight. The ALJ did not adopt Dr. Rosero's opinion wholesale; in fact, the ALJ's RFC determination incorporates some of the limitations Dr. Mahony identified and reflects Dr. Mahony's opinion more than it does Dr. Rosero's opinion. (See Tr. 24–26, 903.)

In addition, the ALJ identified numerous pieces of evidence that undercut Dr. Mahony's assessment that plaintiff had "marked' social impairments interacting with the public, supervisors, and co-worker. The ALJ found that plaintiff was not entirely credible and stressed that plaintiff went to a tanning salon with a friend the day before the hearing, which conflicted with Dr. Mahony's assessment of marked social impairments. (Tr. 26.) "It is well settled that an administrative law judge may disregard a medical opinion premised on the claimant's self-reported symptoms if the administrative law judge has reason to doubt the claimant's credibility." Ziegler v. Astrue, 576 F. Supp. 2d 982, 998–99 (W.D. Wis. 2008), aff'd, 336 F. App'x 563 (7th Cir. 2009). Moreover, Dr. Mahony's psychiatric evaluation, which was prepared the same day as his medical source statement, indicates that plaintiff will only have "moderate" difficulties in relating to others, dealing with stress, and making appropriate decisions. (Tr. 25, 903).

Ultimately, the ALJ did not err in according Dr. Rosero's opinion some weight and rejecting Dr. Mahony's opinion that plaintiff had certain marked limitations. Dr. Rosero's opinion, along with the other evidence in the record, such as plaintiff's own admissions regarding his activities the day before the hearing, constituted substantial evidence to support the ALJ's RFC determination, including the ALJ's rejection of Dr. Mahony's marked limitations findings.

Plaintiff also argues that the ALJ's decision is deficient because the ALJ failed to adequately explain: (1) her conclusion that the opinions of both Dr. Rosero and Dr. Mahony were each entitled to "some weight"; and (2) her statement that Dr. Mahony's opinion was contradicted by certain unspecified evidence in the record. According to plaintiff, the ALJ's statements on these points were too vague and her decision required a more detailed rationale. These arguments are meritless.[10] Although the ALJ did not elaborate on what exactly "some weight" meant, that does not require remand where, as here, the ALJ's decision and RFC determination allows the Court to glean how the ALJ weighed the competing medical opinions.

The Court finds no error in the ALJ's analysis of the opinions of Dr. Rosero and Dr. Mahony.

*iv. The ALJ's Failure to Address Plaintiff's GAF Score of 55*

Plaintiff also criticizes the ALJ for not addressing plaintiff's GAF score, which was part of Dr. Luce's evaluation. (Tr. 383–84.) Plaintiff suggests that this failure requires remand.    Dr. Luce assessed plaintiff a GAF score of 55. (Tr. 369.) A GAF score of 55 indicates that an individual "experiences moderate difficulty in social, occupational, or school situations." Marvin, 2014 WL 1293509, at *2 (citing Petrie, 412 F. App'x at 406).

---

[10] Plaintiff's brief also generally asserts that the ALJ failed to provide sufficiently detailed and reasoned rationales explaining the weight assigned to each medical report in the record. This argument is meritless. The ALJ's decision was sufficient to allow the Court to glean the ALJ's rationale and to permit meaningful review.

As explained previously, an ALJ is not required to specifically discuss every piece of evidence in her decision.  See id. ("the ALJ need not explicitly mention [a plaintiff's] GAF score").  Moreover, the ALJ's decision noted the treatment provided by Dr. Luce, (Tr. 25 (citing Ex. 15E)), which undermines the notion that the ALJ ignored the contents of Dr. Luce's evaluation and the GAF score.  Additionally, the ALJ's RFC determination regarding plaintiff's mental limitations is actually consistent with plaintiff's GAF score, which suggests moderate difficulty in work and other situations.[11]  Thus, even assuming arguendo that the ALJ did not consider the GAF score assessed by Dr. Luce, such an error would be harmless because the RFC already reflects plaintiff's moderate social impairments.

**E. Credibility Analysis**

Plaintiff argues that the ALJ's credibility analysis was deficient.

"The ALJ exercises discretion over the weight assigned to a claimant's testimony regarding the severity of her pain and other subjectively perceived conditions and her resulting limitations." Baron v. Astrue, No. 11-CV-4262, 2013 WL 1245455, at *27 (S.D.N.Y. Mar. 4, 2013) (report and recommendation), adopted by, 2013 WL 1364138 (S.D.N.Y. Mar. 26, 2013).  "Social Security regulations provide a two-step process for evaluating symptoms such as pain, fatigue, shortness of breath, weakness, or nervousness." Cichocki v. Astrue, 534 F. App'x 71, 75 (2d Cir. 2013).  "First, the ALJ must determine whether the medical signs or laboratory findings show that a claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms."  Id.  "If so, the ALJ 'must then evaluate the intensity and persistence of [the claimant's] symptoms' to determine the extent to which the symptoms limit the claimant's capacity

---

[11]  The GAF score determined by Dr. Luce also undermines plaintiff's argument that the ALJ should have sought a medical source statement from Dr. Luce.  Given that the GAF was consistent with the ALJ's RFC determination, it is doubtful that a medical source statement from Dr. Luce would have added anything significant to the record.

for work.'" Id. (quoting 20 C.F.R. § 416.929(c)(1)). "[I]f a claimant's statements about his or her symptoms are not substantiated by the objective medical evidence, the ALJ must consider the other evidence and make a finding on the credibility of the individual's statements." Id. at 76. In doing so, the ALJ considers:

> (i) [The claimant's] daily activities;
>
> (ii) The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [the claimant's] pain or other symptoms;
>
> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of [the claimant's] pain or other symptoms;
>
> (vi) Any measures [the claimant] use[s] or ha[s] used to relieve pain or other symptoms ...; and
>
> (vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

Id. (quoting 20 C.F.R. § 416.929(c)(3)). "The ALJ's decision 'must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight.'" Id. (quoting SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996)). "While it is 'not sufficient for the [ALJ] to make a single, conclusory statement that' the claimant is not credible or simply to recite the relevant factors, [SSR 96–7p, 1996 WL 374186, at *2], remand is not required where 'the evidence of record permits [the reviewing court] to glean the rationale of an ALJ's decision.'" Id. (quoting Mongeur, 722 F.2d at 1040).

In her decision, the ALJ concluded that although plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, his "statements concerning the identity and limiting effects of those symptoms are not entirely credible as they are not supported by objective medical evidence and due to his inconsistent testimony." (Tr. 26.)  In making this determination, the ALJ recounted key points of plaintiff's testimony and, as discussed earlier, stressed a number of inconsistences in that testimony, including plaintiff's admissions about driving and socializing with friends.  Earlier in the decision, the ALJ also stressed that, despite plaintiff's admission that he socialized with friends the day before the hearing, during Dr. Mahony's examination, plaintiff claimed that he primarily socialized with his family.  (Tr. 23.)  And, the ALJ also noted that medical records did not document some of the severe limitations of daily living about which plaintiff testified.  (Tr. 23.)

Plaintiff attacks the ALJ's conclusion that plaintiff was not "entirely credible," contending that the ALJ's analysis was deficient because the ALJ did not specifically identify which portions of plaintiff's testimony were credible and which were not.  (Tr. 386.)  Plaintiff also argues that the ALJ failed to explain how her credibility findings concerning plaintiff's symptoms translated into a capacity to perform work.  (Tr. 386–87.)  Plaintiff cites no case law in support of her suggestion that these alleged deficiencies require remand.

The Court finds that the ALJ's credibility analysis was sufficient, and that her credibility determination was supported by substantial evidence.  See Reyes v. Colvin, No. 14-CV-734, 2016 WL 56267, at *5 (W.D.N.Y. Jan. 5, 2016) (citing SSR 96-7p and holding that ALJ's decision was "specific enough to make clear . . . the weight the ALJ gave to plaintiff's statements about the limiting effects of his symptoms, and the reasons for that weight" where the ALJ concluded that plaintiff's statements about the extent of his "symptoms were not entirely credible" and the ALJ

26

discussed critical portions of the record and identified inconsistencies between plaintiff's testimony and other parts of the record). The ALJ identified internal inconsistencies in plaintiff's testimony, as well as inconsistencies between plaintiff's testimony and other evidence in the record. Here, the Court is able to glean the rationale of the ALJ's decision. Cichocki, 534 F. App'x at 76. For example, it is obvious from the ALJ's decision that she concluded that plaintiff's daily activities included a level of socializing that was inconsistent with Dr. Mahony's opinion that plaintiff had marked social impairments.

For the reasons explained above, plaintiff's attacks on ALJ's credibility analysis fail.

## F. Vocational Expert Testimony

Plaintiff also raises a number of arguments concerning the testimony of the VE. None of these arguments are persuasive.

### 1. The Vocational Expert's Telephonic Testimony

Plaintiff argues that the ALJ's decision to allow the VE to testify via telephone, over plaintiff's objection, was error.

At the time of the April 2013 hearing before the ALJ, the relevant regulations did not permit a VE to testify at a hearing by telephone.[13] 20 C.F.R. § 404.936 (effective August 9, 2010 to June 19, 2013) (addressing only appearances by witnesses "in person or by video teleconferencing").

Decisions in the Second Circuit have divided over whether telephonic testimony in violation of this regulation requires remand. Compare Henry v. Colvin, 561 F. App'x 55, 58 (2d Cir. 2014) (holding that even if VE's testimony by telephone was inconsistent with due process and SSA regulations, it was harmless error because counsel did not object, the record showed no

---

[13] Effective June 20, 2013, the SSA regulations were amended to allow telephonic testimony in certain circumstances. 20 C.F.R. § 404.963(c) (effective June 20, 2013).

technical difficulties or time constraints limiting counsel's effectiveness, and plaintiff alleged no specific prejudice); Palaschak v. Astrue, No. 08–CV–1172, 2010 WL 1257895, at *5 (N.D.N.Y. Mar. 26, 2010) (finding that reliance on VE's telephonic testimony was harmless because counsel "was afforded a sufficient opportunity to cross-examine the VE and did so effectively") with Koutrakos v. Astrue, 906 F. Supp. 2d 30, 35 (D. Conn. 2012) (finding that the ALJ's decision to allow telephonic testimony was not harmless and remanding the case because the VE's testimony was the central issue, and it was possible that if the VE had testified live or via videoconference, the cross-examination of the VE "may have been more effective or . . . the ALJ may have found the medical expert's testimony to be less persuasive").

Here, the Court finds that that the ALJ's error in permitting the VE to testify via telephone was harmless. Plaintiff has not alleged that the VE's telephonic testimony resulted in any specific prejudice.[14]  (Tr. 40–42.)  There were no technical issues during the VE's testimony or any impediments to counsel's cross-examination. (Tr. 76–108, 340, 380.)  Moreover, plaintiff cannot claim that he was unfairly surprised by the VE's telephonic testimony. Plaintiff's counsel was clearly aware that telephonic testimony by the VE was a possibility because counsel filed a pre-hearing letter with ALJ that preemptively objected to any such testimony by the VE. (Tr. 340.) For all of the reasons above, the ALJ's error was harmless.

---

[14] At the April 4, 2013 hearing, plaintiff's counsel objected to the VE testifying over the telephone. (Tr. 41–42). Counsel argued that the regulations did not permit such testimony and that his cross-examination would not be as effective through the telephone as it would be if the VE were present. (Tr. 42). However, when the ALJ asked how his cross-examination would be impeded, counsel responded by saying, "I don't know. I have no idea, okay . . ." (See Tr. 42.)

**2.  The Denial of Plaintiff's Request for Documents Did Not Violate Due Process**

Plaintiff argues that his due process rights were violated when the ALJ denied plaintiff's request for documents relied upon by the VE, (Tr. 340–41) and the notes that the VE drafted in preparation for his testimony, (Tr. 365).  (See generally Tr. 381.)

The Court concludes that plaintiff's due process rights were not violated.  See Henry, 561 F. App'x at 57 (finding that Commissioner's failure to provide copies of the VE's handwritten notes did not violate due process); cf. Galiotti v. Astrue, 266 F. App'x 66, 68 (2d Cir. 2008) (finding that it is sufficient for a VE to identify "the sources he generally consulted to determine" the number of jobs available and noting that plaintiff did not point to "any applicable regulation or decision of this Court requiring a vocational expert to identify with greater specificity the source of his figures or to provide supporting documentation"); but see Henry v. Astrue, No. 07-CV-957, 2008 WL 5330523, at *12 (S.D.N.Y. Dec. 17, 2008).[15]

Moreover, even if a failure to provide such documents could, in some cases, implicate a claimant's due process rights, no remand would be required here because plaintiff's counsel has not asserted any specific prejudice related to the documents.  Instead, plaintiff simply argues that "unless [he] saw the documents he would not know whether he could discredit the VE."  (Tr. 381.) That is not sufficient to compel remand.  Cf. Collins v. Astrue, No. 08–CV–1357, 2010 WL 877541 at *10 (N.D.N.Y. Feb. 4, 2010) (report and recommendation) (holding that because plaintiff could not show how obtaining the documents before or during the hearing would have affected the case,

---

[15]  In Henry v. Astrue, 2008 WL 5330523, the district court held that a due process violation occurred where the plaintiff did not receive certain documents that the VE relied upon in reaching his conclusion.  However, a subsequent decision in the Henry litigation questioned the correctness of the court's decision and suggests that subsequent decisions by the Second Circuit undermined the basis for the court's original determination that a due process violation occurred.  See Henry v. Astrue, No. 11-CV-2590, 2013 WL 1313788, at *5 (S.D.N.Y. Mar. 21, 2013) ("The Second Circuit's decision in [Brault v. Social Sec. Admin., 683 F.3d 443, 450 (2d Cir. 2012)]—rendered after [the court's 2008 decision in Henry] makes clear that the Commissioner was not legally required to furnish these materials.  The law only requires that the Commissioner provide notice as to the source and substance of a vocational expert's proffered estimates—this was done."  (citations omitted)).

29

there was no reversible error), adopted in part and rejected in part, 2010 WL 786286 (N.D.N.Y. Feb. 26, 2010).  Notably, the VE testified that he used statistics from the federal and New York State Departments of Labor and that their databases were available online.  (Tr. 105).  Yet, despite now knowing that information, plaintiff has not alleged how earlier disclosure about the VE's reliance on these common and publicly available sources would have had any impact on the proceeding.

### 3.  The Credibility of the VE's Testimony

Plaintiff argues that the VE's testimony was simply not credible, pointing to a number of alleged deficiencies in the VE's testimony.  (Tr. 364–66, 385–86.)  Of course, the question of the VE's credibility was a matter for the ALJ to determine.  Even considering the alleged weaknesses in the VE's testimony raised by plaintiff, the VE's testimony still constituted substantial evidence to support the ALJ's determination.

## G. Plaintiff's Remaining Arguments

Plaintiff raises a number of other arguments in his brief, his letters to the ALJ, and his letter to the Appeals Council.  The Court has considered all of these arguments.  None of them show that the ALJ erred or warrant remanding this case.

## IV. CONCLUSION

For the foregoing reasons defendant's motion for judgement on the pleadings is GRANTED and plaintiff's cross-motion for judgement on the pleadings is DENIED.  The Clerk of Court is directed to enter judgment in favor of defendant.

Dated:  August 5, 2016
Central Islip, New York

                              /s/     (JMA)
                    JOAN M. AZRACK
                    UNITED STATES DISTRICT JUDGE